IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| BARRY MORRIS, #N42509, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 24-cv-1649-RJD |
| v. ) | |
| ) | |
| JOHN BARWICK, IDOC, DR. PERCY ) | |
| MYERS, ) | |
| ) | |
| Defendant. ) | |
| ) | |

# ORDER

**DALY, Magistrate Judge:**

This matter comes before the Court on Plaintiff's Motion for Preliminary Injunction. Doc. 12. Defendant Barwick filed a Response and also filed 368 pages of Plaintiff's medical records.[1] Docs. 30 and 46. Plaintiff filed a Reply and Motion for Sanctions. Docs. 34 and 35. Defendant Barwick filed a Response to the Motion for Sanctions; Plaintiff then filed a Reply. Docs. 39 and 52.

## Background

Plaintiff filed this case pursuant to 42 USC §1983, the Americans with Disabilities Act ("ADA"), and the Rehabilitation Act ("RA") on July 2, 2024.[2] Plaintiff is an inmate of the Illinois

---

[1] This case was originally assigned to District Judge Yandle, who ordered Defendant Barwick to file a Response to Plaintiff's Motion for Preliminary Injunction. Doc. 17.

[2] This is one of three cases opened by the Court upon receipt of a motion for temporary restraining order from Plaintiff. *See also Morris v. Barwick, et al.*, Case No. 24-cv-1470-MAB (S.D. Ill. Jun. 10, 2024); *Morris v. Barwick, et al.*, Case No. 24-cv-1839-SMY (S.D. Ill. Aug. 5, 2024). Plaintiff notified the Court of his intention to proceed with the claims in this case on July 12, 2024 and filed a Complaint on August 5, 2024. Docs. 8 and 11. Meanwhile, he voluntarily dismissed case No. 24-cv-1470-MAB on July 15, 2024 and the Court closed Case No. 24-cv-1839-SMY as

Department of Corrections ("IDOC") and currently housed at Pinckneyville Correctional Center ("Pinckneyville"). Following the Court's threshold review conducted pursuant to 28 U.S.C. 1915A, Plaintiff's case proceeds on the following claims:

> Count 1: Eighth Amendment claim against Dr. Myers and Warden Barwick for cancelling Plaintiff's longstanding pain medication, a wheelchair, ADA van with wheelchair, ADA showers, double mattress, and single-man cell status at Pinckneyville.
>
> Count 2: ADA and/or Rehab Act claims against IDOC and Warden Barwick in his official capacity for failing to accommodate Plaintiff's disabilities by denying him a wheelchair, ADA ADA van with wheelchair, ADA showers, and single man cell status at Pinckneyville.

Doc. 17.

Plaintiff alleges that he was diagnosed with spinal disc herniation and lumbar spinal stenosis in 2014; because of these conditions, he has chronic back and leg pain. Doc. 11, pp. 7-8. In 2021, a back specialist recommended surgery. *Id*., p. 8. He transferred to Pinckneyville from Western Illinois Correctional Center in February 2024; he alleges that "at his previous three facilities," he received Tramadol for his chronic back and left leg pain. *Id*. At Pinckneyville, Plaintiff has been treated by Defendant Dr. Percy Myers. Dr. Myers is an employee of Wexford Health Sources, Inc. (not a defendant), a private company that contracts with IDOC to provide medical care to inmates.

Prior to the Pinckneyville transfer, Plaintiff had a single man cell permit of indefinite duration because he was "up all hours of the night using the toilet" related to his enlarged prostate and because he has crutches which could be used by a cellmate against Plaintiff as a weapon. *Id*.,

duplicative.

p. 8. He also was transported outside of the facility in an ADA van with a wheelchair. *Id*.

When Plaintiff arrived at Pinckneyville, Dr. Myers discontinued the Tramadol prescription. *Id*. Plaintiff's chronic pain has gotten worse; he contends that because of his pain, his blood pressure has increased so significantly that he must take high blood pressure medication. *Id*. Plaintiff wakes up frequently at night with stabbing pain on his left side (due to his sciatic nerve). *Id*., p. 3. *Id*. He has a roommate who threatens to take Plaintiff's crutches and beat him. *Id*., pp. 5-6.

Plaintiff has no wheelchair and must walk long distances to chow, church, the law library, and the health care unit. *Id*., p. 3. When he is transported out of Pinckneyville, it is not in an ADA van. *Id*. He has "several" medical writs scheduled in the future and believes he will suffer irreparable injury if he is transported in a regular van or vehicle. *Id*., pp. 4-5.

To no avail, Plaintiff raised these issues with Dr. Myers and also sent letters and emergency grievances to Warden John Barwick. Plaintiff seeks the following injunctive relief: (1) transportation in an ADA van with wheelchair; (2) medical permit for single man cell; (3) prescription for Tramadol or, in the alternative, use of a wheelchair while at Pinckneyville. Doc. 12, p. 10.

### Evidentiary Hearing

Plaintiff, Christine Brown (health care unit administrator at Pinckneyville), and Dr. Myers testified at the hearing.

**Plaintiff's testimony**

Prior to Western Illinois Correctional Center, Plaintiff was housed at Menard Correctional Center. He saw an outside surgeon who recommended surgery and that Plaintiff be transported in an ADA van. Plaintiff then transferred to Western Illinois Correctional Center and while he

was housed there, he was transported to medical appointments in an ADA van.  Plaintiff has been transported in an ADA van for the last five years.

When Plaintiff arrived at Pinckneyville, Dr. Myers "immediately discontinued everything", including his single man cell permit.  Dr. Myers was not interested in reviewing Plaintiff's medical records and said "there was nothing wrong with [Plaintiff]."  Plaintiff was "in the process" of undergoing back surgery when he was transferred from Western Illinois to Pinckneyville.  He asked Dr. Myers to order a consultation with a surgeon, but Dr. Myers instead obtained approval for Plaintiff to undergo a steroid injection.

Plaintiff traveled to a medical appointment on June 13, 2024 and fell out of the "regular" (non-ADA) van.  He has additional appointments scheduled for his cataracts and, at some point, the steroid injection.

Tramadol (taken with Gabapentin) is the only medication that ever alleviated his pain. Plaintiff currently has unbearable pain in his left leg because he is not taking Tramadol.  Plaintiff understands that Tramadol is an opioid medication, but he has never abused any of his medications. He currently takes Tylenol, Motrin, and Neurontin for the pain; he also takes high blood pressure medication because of the significant pain he experiences.  His pain is so significant that he has occasionally missed meals because he cannot walk to the chow hall.  If he had access to a wheelchair, he would be able to make it to chow hall on time and not be "that guy" that holds up lines.  Plaintiff lives in the cell house that is farthest away from the health care unit.

Plaintiff cannot lie quietly in his bed at night because he has anxiety and frequently urinates.  Plaintiff currently has a cellmate and their living situation is "pretty contentious." Plaintiff's property disappears.  Plaintiff's current cell mate is his fourth cell mate since arriving at Pinckneyville.

**Christine Brown, health care unit administrator**

Ms. Brown testified that Plaintiff's most recent healthcare visit was on October 11, 2024; he saw a nurse on the sick call line. Plaintiff was taking Tylenol, Motrin, and Neurontin for pain; he also takes high blood pressure medication. Typically, Tramadol is only prescribed short term to inmates at Pinckneyville. The ADA van is normally used by stroke patients and paralyzed or partially paralyzed inmates. It would strain Pinckneyville's resources to use the ADA van to transport inmates for which it was not a medical necessity. There are approximately forty inmates at Pinckneyville who are in wheelchairs and therefore need the ADA van.

**Dr. Myers**

Dr. Myers is no longer working at Pinckneyville Correctional Center. At his initial evaluation of Plaintiff in early 2024, Plaintiff requested certain privileges provided by the IDOC, including a lower bunk permit, lower gallery permit, and wheelchair. Dr. Myers "reviewed the chart and…saw the nerve conduction test, which determines whether the muscles in his leg were getting adequate nerve impulses. The nerve conduction test showed spinal stenosis-and it is severe-but not bad enough to interfere with ability to walk [which] means that the nerves that are coming out of the spinal column and going to the muscles in his legs, so therefore no interference and there should be normal function of his legs." Dr. Myers referred Plaintiff for a steroid shot because he has severe stenosis, which means his nerves are inflamed.

Dr. Myers recalls Plaintiff asking for Tramadol, a narcotic pain medication. Both the CDC and FDA recommend that narcotic pain medications be used for short periods of time only, primarily for patients who are recovering from surgery. There are "lots of consequences" for long-term narcotic use, including increased risk of heart attack, malnourishment, increased risk of fractures, dependency, and sleep disturbances. When Dr. Myers explained these side effects to

Plaintiff, Plaintiff became irritated and "got up and left."

Dr. Myers did not determine the ADA van is necessary for Plaintiff's physical safety. Other than the automatic lift for wheelchairs, there is no significant difference between the van and other vehicles used to transfer inmates. There are two guards assigned to Plaintiff for every appointment and they are with him constantly, including while getting on and off (or in and out of) the transport vehicle.

Similarly, Dr. Myers did not determine Plaintiff needs a wheelchair at Pinckneyville, based upon the results of the nerve conduction study and his physical exam of Plaintiff which showed no muscle wasting in Plaintiff's legs. Dr. Myers believes that Plaintiff needs to stay active.

Regarding the single cell permit, Dr. Myers explained that IDOC cannot "give everyone a single cell permit who may disturb their inmates in the middle of the night." Single cell permits are reserved for inmates at the end of their life, or who need a temporary single cell because of a condition like scabies.

Plaintiff questioned Dr. Myers why he wrote a note in Plaintiff's medical records that states "has been seen on film weight lifting and playing basketball walking and crutches." Doc. 46, p. 256. Dr. Myers answered "it was in your records by a practitioner at a previous facility that you were seen on video playing basketball and lifting weights."

Dr. Myers testified that his decisions to provide/deny Plaintiff's requested treatment were based on his physical exam of Plaintiff, the nerve conduction study, and magnetic resonance imaging. However, as pointed out by Plaintiff, the medical records provided to the Court and the parties prior to the hearing by Defendant Barwick did not include any nerve conduction studies; also, while the records included MRI reports for Plaintiff's brain and cervical spine, there were no reports for lumbar spine imaging. Dr. Myers testified that he personally viewed the nerve

conduction study report; his notes mention the nerve conduction study and at least one MRI. He further explained that the pain clinic would not give Plaintiff a steroid injection without an MRI of the lumbar spine, but he was unable to provide the Court with any information about the MRI report that he purportedly relied upon when making decisions about Plaintiff's care. Following the hearing, the Court entered the following Order:

> On or before October 24, 2024, Defendant Barwick shall file a notice with the Court that either confirms or denies the existence of a lumbar spine MRI report and nerve conduction study in Plaintiff's medical records at Pinckneyville Correctional Center that were accessible to Dr. Myers prior to Dr. Myers' departure from the facility. If the records of a nerve conduction study and lumbar spine MRI report exist but were not previously submitted to the Court, Defendant Barwick shall file those records along with the Notice.

**Plaintiff's Medical Records**

Plaintiff's multiple visits with Dr. Myers are included in the 368 pages of medical records submitted by Defendant Barwick prior to the hearing. Plaintiff saw Dr. Myers on February 22, 2024 regarding permits at Pinckneyville. Doc. 46, pp. 125-26. The notes from this visit are mostly illegible. *Id*. Dr. Myers saw Plaintiff again on March 15, 2024 and noted the following:

> "requesting a double mattress. Patient has been in the clinic 2/22/24 with a request for a double mattress was told he does not qualify for a special bed cover/mattress. The decision was based on his most recent physical exam which indicated all is normal and in the MRI of his back-MILD (not severe) stenosis and a normal nerve conduction study. If Patient had abnormal nerve conduction study or severe stenosis or an abnormal physical exam, then a different treatment plan would be implemented. As of now, no double mattress is needed.

*Id*., pp. 183-84. Dr. Myers saw him again 11 days later; Plaintiff wanted Dr. Myers to prescribe Tramadol. *Id*., pp. 189-90. Dr. Myers noted that he "attempted to explain to him that the CDC and FDA both recommend only short term use of narcotics…[Plaintiff] constantly was interrupting

me and then left." *Id*., pp. 189-90.

Plaintiff saw Dr. Myers again on May 24, 2024. *Id*., p. 178. Dr. Myers noted that "patient is requesting a wheelchair for long distance….subject reports has a back problem…Physical exam [illegible] normal. EMG normal and MRI mild stenosis…explained to him that with all the normal tests/exams and MRI he does not need a wheelchair also, has [illegible] MRI pending and will follow up then." *Id*.

Plaintiff saw Dr. Myers again on June 27, 2024. *Id*., p. 221. The notes from this visit are mostly illegible. At the evidentiary hearing, Dr. Myers read from the record and testified that he had written "lower back pain with positive findings on an MRI." *Id*. He also noted that he would submit a request to collegial review for Plaintiff to receive an epidural steroid injection ("ESI"). *Id*. Collegial review, also known as "utilization management", is a process by which Wexford approves (or does not approve) certain services and treatments requested by physicians treating inmates within the IDOC.

There is another note in Plaintiff's records dated June 27, 2024 made by an unidentified individual that simply states "collegial filed for MRI." *Id*., p. 241. There is a Wexford "Notice of Authorization" form in Plaintiff's records dated July 3, 2024 that states "service is authorized" for Plaintiff to receive a steroid injection. *Id*., p. 268. The "Comments" section on this form states "request for an ESI L4 for a patient with complaints of low back pain. Per MRI patient needs an L transforaminal steroid injection." *Id*.

On August 8, 2024, Dr. Myers wrote that Plaintiff requested a wheelchair for long distances. Dr. Myers noted "nerve conduction test-no deficits. Patient has been seen lifting weights and playing basketball. Has crutches….he does not meet any criteria for a wheelchair." *Id*., p. 248. Plaintiff was referred to Dr. Myers again on August 21, 2024 for a wheelchair

evaluation. *Id.*, p. 256. Dr. Myers noted "ambulates with crutches has been seen on film weight lifting and playing B.B." and denied Plaintiff's request for a wheelchair. *Id.*

In response to the post-hearing Order (Doc. 58), Defendant Barwick submitted certain records to the Court, including a nerve conduction study dated January 27, 2020 that stated "all nerve conduction studies were within normal limits." Doc. 60-1. Defendant Barwick also submitted a report of Plaintiff's lumbar spine MRI taken May 25, 2019 that showed disc bulging at all lumbar levels, as well as mild to moderate narrowing at L1-L2, L3-L4, L4-L5, L5-S1. Doc. 60-4, pp. 3, 4.

In addition to the records from Plaintiff's chart, Defendant Barwick submitted records to the Court that his counsel obtained from another court case filed by Plaintiff. Doc. 60-5. These records include the following:

- report from 2016 reflecting that plaintiff received a L5-S1 steroid injection. Doc. 60-5, p. 4.
- record of a consultation with Dr. William Payne on June 14, 2019 that states "the way he describes his radicular complaints at L4 is totally consistent with his MRI findings. I think he is being honest and genuine….there is no way I can guarantee him that he is going to return to normal if I do the surgery on him, but I do think that I could help him with his pain and hopefully decrease the numbness and tingling." *Id.*, pp. 8, 9.
- record of a consultation with Physician Assistant Jacob Monsivais at SIU Medicine/Neurology on December 2, 2019 in which the PA recommended that Plaintiff undergo an EMG/nerve conduction study "to help with evaluation and development of a treatment plan." *Id.*, pp. 15-18.
- record of a consultation that occurred on June 22, 2020 with Dr. Louis Graham. *Id.*, pp. 19-23. Dr. Graham noted that "MRI shows severe neural foraminal stenosis at L4-5 L5-S1" and "normal EMG of the left lower extremity." *Id.*, p. 23. Dr. Graham recommended a L4 transforaminal epidural steroid injection if an increase in Plaintiff's gabapentin prescription did not improve Plaintiff's pain. *Id.*, p. 21. One day later, Dr. Graham made an addendum, noting "I spoke with his PCP at the prison. He reports that the patient was caught jumping and exercising as well as lifting 250 lb. of weight is on camera. This level of functional abilities not consistent with the symptoms he is reporting. There may be

an element of malingering." *Id*.

**Motion for Preliminary Injunction (Doc. 12)**

To obtain a preliminary injunction, Plaintiff must establish that (1) he will suffer irreparable harm without the injunction; (2) "traditional legal remedies are inadequate"; and (3) he has "some likelihood of succeeding on the merits." *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020). An injunction that requires an affirmative act by the respondent is a mandatory preliminary injunction and should be "sparingly issued." *Id*. (*citing Graham v. Med. Mut. of Ohio*, 130 F.3d 293, 295 (7th Cir. 1998)). The Prison Litigation Reform Act ("PLRA") mandates that any preliminary injunctive relief ordered in this case must be "narrowly drawn, extend no further than necessary to correct the harm…," and "be the least intrusive means necessary to correct that harm." 18 U.S.C. §3626 (a)(2).

Plaintiff has established that he will suffer irreparable harm if the mandatory preliminary injunction is not granted. He describes significant pain that began after Dr. Myers discontinued the medication and supportive devices that he had utilized at previous prisons. Plaintiff made multiple unsuccessful attempts to be re-evaluated for those supportive devices. He misses meals and other services at the prison because of his significant pain and inability to walk long distances. He fell out of a transport van in June. Plaintiff has also established that traditional legal remedies are inadequate. If he prevails at trial the jury may award him money damages, but monetary compensation seems inadequate in comparison to Plaintiff's continued inability to travel safely to medical appointments and difficulties moving within the prison to eat, use the law library, and attend church.

The record before the Court also reflects some likelihood that Plaintiff will succeed on the merits of his claims. For his deliberate indifference claims, Plaintiff must show that Defendants

"acted or failed to act despite [their] knowledge of a substantial risk of serious harm" to Plaintiff. *Brown v. LaVoie*, 90 F. 4th 1206, 1214 (7th Cir. 20124).  Doctors who persist "in a course of treatment known to be ineffective" may be liable under the Eighth Amendment.  *Petties v. Carter*, 836 F.3d 722, 730 (7th Cir. 2016).

Here, Dr. Myers testified repeatedly that he based his treatment decisions on his physical exam of Plaintiff, the MRI, and EMG study.   However, Defendants were unable to provide the Court with the MRI or EMG study before or during the hearing.  Having reviewed the medical records that were submitted post-hearing, the Court now has more questions than answers.  The EMG study is nearly five years old, and the most recent MRI of Plaintiff's lumbar spine is more than five years old.  Perhaps newer imaging or tests are not necessary, but the undersigned and Plaintiff did not have these records at the hearing and did not know when the last MRI and EMG study were conducted to question Dr. Myers on this issue.  Moreover, Plaintiff's previous physicians who prescribed Tramadol and allowed Plaintiff to have assistive devices did so presumably with access to the same MRI and EMG results that Dr. Myers relied upon to discontinue those devices and medication.

The Court acknowledges that simply because two physicians disagree on an appropriate course of treatment does not mean that one is acting with deliberate indifference.  However, Dr. Myers' testimony is contradicted by his notes in Plaintiff's chart.  At the hearing, Dr. Myers referred repeatedly to Plaintiff's "severe" stenosis, but opined that despite the severe stenosis, the wheelchair and ADA van were not necessary.  However, when Dr. Myers saw Plaintiff seven months ago, he noted that Plaintiff's MRI showed "mild (not severe) stenosis and a normal nerve conduction study" and "**if [Plaintiff] had** abnormal nerve conduction study **or severe stenosis or** an abnormal physical exam, **then a different treatment plan would be implemented**."   Doc. 46,

p. 1**84 (emphasis added).    Dr. Myers made another reference to Plaintiff's "mild" stenosis in his May 2024 notes.

Other than Dr. Myers' hearing testimony, the only other evidence in the record that indicates Plaintiff has severe stenosis is in Dr. Graham's consultation report from 2020, which states "MRI shows severe neural foraminal stenosis at L-4-5 L5-S1."  That report also refers to Plaintiff "jumping and exercising…[and] lifting weight..on camera."  Dr. Myers perhaps relied on this reference in August 2024 when he twice denied Plaintiff the use of a wheelchair at Pinckneyville, noting that Plaintiff was seen "on film weightlifting and playing basketball"; nothing else in the record currently suggests that Plaintiff was seen exercising after 2020.  Doc. 46, pp. 248, 256.  The Court questions why Dr. Myers would rely on a vague statement regarding Plaintiff's ability to exercise in 2020 as reason to deny him a wheelchair in 2024, considering that since 2020, another doctor provided Plaintiff the supportive devices and permits that Dr. Myers then discontinued.  To the extent there is a reasonable explanation for this reliance, it was not provided at the hearing-again, presumably because Dr. Graham's consultation report was not available to the Court or Dr. Myers at the hearing.

In sum, the record currently indicates that Plaintiff has some likelihood of success at prevailing on his Eighth Amendment claim against Dr. Myers.  A reasonable juror could infer from Dr. Myers' inconsistent statements that he persisted in a course of treatment known to be ineffective.[3]  Plaintiff saw Dr. Myers at least seven times in seven months for his back pain and at each of those visits, Plaintiff told Dr. Myers that his pain could not be controlled, nor could he safely ambulate or travel without the treatment/assistive devices that Dr. Myers discontinued.  Dr.

---

[3] Of course, the inconsistent statements may also simply be related to Dr. Myers no longer working at Pinckneyville and not having full access to Plaintiff's chart.   However, at the hearing, Dr. Myers did not offer that explanation.

Myers nonetheless persisted in his plan of care. The record currently does not reflect a coherent explanation for Dr. Myers' refusal to allow Plaintiff access to a wheelchair on-site or ADA van for offsite treatment.

Regarding his ADA/RA claim against IDOC, Plaintiff must establish the following: (1) "he is a 'qualified individual with a disability'"; (2) "that he was denied 'the benefits of the services, programs, or activities of a public entity' or otherwise subjected to discrimination by such an entity"; and (3) "that the denial or discrimination was 'by reason of' his disability." *Wagoner v.. Lemon*, 778 F.3d 586, 592 (7th Cir. 2015) (internal citations and quotations omitted). Plaintiff has presented evidence of the debilitating effects of his stenosis, and that his condition (without the ADA supportive devices that he was provided at previous facilities) prevents him from accessing meals, church, and the law library. This evidence sufficiently establishes that Plaintiff is reasonably likely to succeed on his ADA/RA claim.

Mindful that any injunctive relief awarded in this case must be narrowly drawn and the least restrictive means necessary to correct harm to Plaintiff, Plaintiff's Motion for Preliminary Injunction is GRANTED IN PART AND DENIED IN PART. Plaintiff's requests for specific medication, living arrangements, transportation, and assistive devices are DENIED. Given the confusion regarding Plaintiff's current condition and necessary supportive devices, a physician or physician extender who is responsible for evaluating and treating inmates at Pinckneyville SHALL reevaluate treatment for Plaintiff's stenosis, considering his current symptoms and records of past medical treatment and tests. Ideally, this evaluation would take place after Plaintiff's approved MRI, but the Court has no information regarding when the MRI will take place. Accordingly, on or before November 14, 2024, IDOC SHALL arrange for Plaintiff to be evaluated by a physician or physician extender at Pinckneyville Correctional Center to determine whether additional

treatment or supportive devices are necessary for Plaintiff's stenosis. On or before November 15, 2024, counsel for IDOC shall file a notice with the Court that includes the record from Plaintiff's evaluation by the physician or physician extender. If the handwriting of that evaluation is illegible, counsel for IDOC shall submit evidence necessary for the record to reflect the physician's (or physician extender's) findings and recommended treatment (if any) accurately and completely.

### Motion for Sanctions (Doc. 34)

In response to Plaintiff's Motion for Preliminary Injunction, Defendant Barwick filed an declaration by Christine Brown regarding Plaintiff's recent medical records. In the Declaration, Ms. Brown stated that "[o]n August 8, 2024, Dr. Myers also noted that Mr. Morris was seen lifting weights and playing basketball." The Court questions the reliability of this evidence-and the relevancy of it-considering that the identity of the person who allegedly saw Plaintiff playing basketball and lifting weights is unknown and this alleged observation occurred at least four years ago.

Plaintiff contends that Defendant Barwick should be sanctioned for providing false information to the Court. However, Ms. Brown's statement is not false. Dr. Myers did, in fact, write in Plaintiff's chart on August 8, 2024 that Plaintiff was seen lifting weights and playing basketball. The Court questions the admissibility of that evidence, and gave it little consideration when ruling upon Plaintiff's Motion for Preliminary Injunction, but there is no basis to sanction Defendant Barwick. Plaintiff's Motion for Sanctions is DENIED.

### Motion to Receive Correction Motion (Doc. 48)

On September 18, 2024, Defendant Barwick filed a Response to Plaintiff's Motion for Sanctions, as well as a Motion for Leave to Supplement Response to the Motion for Preliminary Injunction with the 368 pages of Plaintiff's medical records. Docs. 39 and 40. On September

23, 2024, Plaintiff filed a "Motion to Receive Correct Motion" (Doc. 48) in which he informed the Court that while he received a Notice of Electronic Filing from the Court regarding the documents filed by Defendant Barwick on September 18, 2024, Plaintiff had not received the Motion for Leave or the Response to the Motion for Sanctions. Plaintiff had received a duplicate copy of Defendant's Response to the Motion for Preliminary Injunction, so he thought perhaps Defendant mistakenly sent him the wrong pleading. This issue appears to have been resolved, however, because Plaintiff ultimately filed a Reply to Defendant's Response to the Motion for Sanctions that addressed the information contained in Defendant Barwick's response. Accordingly, the Motion to Receive Correct Motion is DENIED AS MOOT.

### Motion for Leave to File Supplemental Pleading with Exhibits (Doc. 53)

Plaintiff filed a Motion for Leave to supplement his Complaint with exhibits "to show this Court that more proof of deception is yet to be revealed." The exhibits consist of grievances and correspondence between Plaintiff and prison officials. The Court does not accept supplements to complaints and notes that Plaintiff's Complaint survived threshold review without the exhibits. Plaintiff's Motion for Leave is DENIED WITHOUT PREJUDICE. Plaintiff may attach some of or all the documents to future pleadings if they are relevant to arguments made in those pleadings.

**IT IS SO ORDERED.**

**DATED:** October 31, 2024

/s/ *Reona J. Daly*
**Hon. Reona J. Daly**
**United States Magistrate Judge**